**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Jana Berghoff,                                             Civil No. 16-2472 (DWF/SER)

                    Plaintiff,

v.                                                                        **MEMORANDUM**
                                                                   **OPINION AND ORDER**

Patterson Dental Holdings, Inc.,

                    Defendant.

_____

Jonathan P. Norrie, Esq., Lewis A. Remele, Jr., Esq., and Uzodima F. Aba-Onu, Esq.,
Bassford Remele, counsel for Plaintiff.

Danielle W. Fitzsimmons, Esq., Emily M. Peterson, Esq., and Neal T. Buethe, Esq.,
Briggs & Morgan, PA, counsel for Defendant.
_____

**INTRODUCTION**

        This matter involves allegations of unequal pay, discrimination and retaliation.

The case is before the Court on a Motion for Summary Judgment brought by Defendant

Patterson Dental Holdings, Inc. ("Defendant" or "Patterson") (Doc. No. 49).  For the

reasons set forth below, the Court grants in part and denies in part the motion.

**BACKGROUND**

        Patterson is a distributor of supplies, equipment, software, digital technology and

services for dentists and dental laboratories throughout the United States.  Plaintiff Jana

Berghoff has over 40 years of experience in the dental industry.  (Doc. No. 52

("Fitzsimmons Decl.") ¶ 2, Ex. 4 ("Plaintiff Dep.") at 15-34.)  In 1999, Patterson hired

Plaintiff as a software trainer.  (*Id*. at 24.)  In that position, Plaintiff traveled to various dental offices throughout the United States to train dentists and dental staff on how to use Eaglesoft computer software.  (*Id*. at 24-25; Fitzsimmons Decl. ¶ 2, Exs. 6-7 ("Schauer Dep.") at 16-17.)  Eaglesoft is a Patterson-owned product that manages dental offices' accounting and insurance functions, effectively replacing the "paper chart."  (Plaintiff Dep. at 47, 50.)  Plaintiff worked in this position through 2006, earning approximately $70,000-80,000 annually.  (Plaintiff Dep. at 27.)  In 2006, Plaintiff became a Patterson Technology Representative and was responsible for selling certain Patterson software technologies and hardware.  (*Id*. at 31.)  Plaintiff claims she earned over $100,000 annually on commissions in this position.  (*Id*. at 31-33.)

In 2008, Patterson eliminated Plaintiff's sales position.  (*Id*. at 32.)  Plaintiff then accepted the position of Corporate Technology Marketing Manager (CTMM).  (*Id*. at 32-34.)[1]  In this position, she earned $90,000 in annual salary and was eligible for a bonus of up to 25% of her base salary.  (*Id*. at 34-35.)  Plaintiff asserts that she understood that her salary would grow.  (Doc. No. 70 ("Plaintiff Decl.") ¶ 1, Ex. 1.)  As a CTMM, Plaintiff marketed several Patterson software products.  The majority of her time was spent marketing Eaglesoft.  (Plaintiff Dep. at 43-44.)  Patterson offers the front-desk portion of Eaglesoft to offices for free, but sells add-on software.  (Plaintiff Dep. at 51-52.)  Plaintiff also marketed CAESY, a software product that provides patient

---

[1]    Plaintiff testified that she originally declined this position before she knew that her sales position was to be eliminated because the salary was lower.  (Plaintiff Dep. at 32-33.)

education videos and on-line education.  (*Id.* at 46, 50-51.)  Plaintiff also had oversight and partial responsibility for other commercial products.  (*Id.* at 44-50.)  In addition, Plaintiff was responsible for training and supervising Patterson technology advisors, including Technology Advisor IIIs.  (*Id.* at 46-47, 58-60.)  Technology Advisor IIIs develop educational materials for customers, provide support for high-profile customers, and oversee lower level technology advisors.  (*Id.* at 60.)

In 2008, Plaintiff began reporting to Josh Killian.  (*Id.* at 69.)  In 2011, Killian reviewed Plaintiff's performance, noting her strong product knowledge and training ability, but also stating that Plaintiff failed to understand Patterson's culture and vision for its products.  (Fitzsimmons Decl. ¶ 2, Ex. 10.)  Killian suggested to Plaintiff that she travel less and spend more time in the office to help meet deadlines.  (*Id.*)  Killian also noted that Plaintiff should approach her work more as a marketer, rather than a trainer or sales person.  (*Id.*)

In 2012, Killian and Plaintiff discussed her performance.  (Plaintiff Dep. at 95-97; Fitzsimmons Decl. ¶ 2, Ex. 11.)  Plaintiff expressed frustration that she was not included in general strategy meetings.  (Fitzsimmons Decl. ¶ 2, Ex. 11.)  Plaintiff also indicated that she was not happy with her salary and that she thought other male employees in equal positions were paid more.  (*Id.*; Plaintiff Dep. at 102-03.)  Plaintiff has identified Rich Lake and Steve Compau as two such employees.

Lake was hired in 1997.  (Fitzsimmons Decl. ¶ 2, Ex. 12 ("Lake Dep.") at 14-15.)  Lake started off troubleshooting CEREC machines for dentists and eventually assumed responsibility for marketing CEREC/CAD-CAM technology.  (*Id.* at 15, 25-26.)

CEREC/CAD-CAM technology is digital technology that allows for crowns to be designed and milled on-site. (*Id*. at 26.) Patterson is the exclusive dealer of CEREC/CAD-CAM technology, and in the fiscal year 2016, generated significantly more revenue than that generated by Eaglesoft and CAESY products. (Fitzsimmons Decl. ¶ 2, Ex. 5 ("Killian Dep.") at 230; Schauer Dep. at 23-24.) In 2013, Lake was named a Marketing Manager III. (Lake Dep. at 26, 39; Killian Dep. at 38-41.) Lake's annual salary was approximately $109,000. (Lake Dep. at 34.) By 2015, Lake's salary was approximately $121,000. (Fitzsimmons Decl. ¶ 2, Ex. 31.)

Compau was hired in 2011 and was responsible for marketing digital imaging equipment—digital x-ray products used both inside and outside a patient's mouth. (Fitzsimmons Decl. ¶ 2, Ex. 13; Plaintiff Dep. at 210-11.) In 2016, this equipment generated significantly more revenue than Eaglesoft and CAESY. (Killian Dep. at 231; Schauer Dep. at 23-24.) Compau's initial salary at Patterson was approximately $110,000, and when he left Patterson in 2015, his salary was approximately $114,000. (Killian Dep. at 169; Fitzsimmons Decl. ¶ 2, Ex. 14.)

In 2013, Plaintiff again raised concerns about her salary with Killian. (Fitzsimmons Decl. ¶ 2, Ex. 16; Killian Dep. at 181; Plaintiff Dep. at 114, 118.) Plaintiff also claims that she rarely received supervision under Killian, that Killian ignored scheduled meetings with her, and that Killian would have dinner with Lake and Compau during work travel without inviting Plaintiff. (Fitzsimmons Decl. ¶ 2, Ex. 17 at 9.) Plaintiff reported to Killian until February 2016.

In early 2016, Patterson restructured its marketing department. Patterson hired a new Vice President of Marketing for Commercial Software, Cecile Schauer, making Schauer Plaintiff's new supervisor. (Fitzsimmons Decl. ¶ 2, Ex. 15.) Compau and Lake, who marketed digital technologies, reported to the new Director of Marketing for Digital Technologies. (Plaintiff Dep. at 126.) After a few months, Schauer concluded that Plaintiff "struggled significantly" with her marketing responsibilities by, for example, failing to complete tasks on time, but also that Plaintiff was more comfortable and passionate about her training responsibilities on the technology side. (Schauer Dep. at 52.) Realizing that the department was being restructured, Plaintiff spoke to Schauer about her "dream scenario"— a director-level position supervising technology advisors. (Plaintiff Dep. at 129-31.)

On March 4, 2016, Schauer completed a draft restructuring plan. (Fitzsimmons Decl. ¶ 2, Ex. 18.) The plan was intended to grow the software business while launching new cloud-based practice management software. (Schauer Dep. at 83-84.) To accomplish the goals of the plan, Schauer suggested creating four focused positions in the following areas: customer acquisition, customer retention, E-services, and new software launch. (*Id.*) Schauer wanted the positions to be staffed individually to drive strong results. (*Id.*) Schauer considered transferring Plaintiff's marketing responsibilities to another employee and at one point envisioned Plaintiff managing the Technology Advisor III team. (Fitzsimmons Decl. ¶ 2, Ex. 18 at 8.)

Later in March 2016, Schauer again met with Plaintiff, at which time Plaintiff indicated that she felt disrespected and that she was aware she was paid less than Lake

and Compau.  (Plaintiff Dep. at 139-40.)  Plaintiff also shared her belief that her treatment was gender related.  (Plaintiff Dep. at 141-42.)  Schauer indicated that she would pass Plaintiff's concerns to Human Resources (HR) and follow-up in early April.  (Schauer Dep. at 120.)

On March 21, 2016, Schauer met with Mark Buschbacher, Director of HR, and Katie Graham, an HR generalist, to discuss restructuring.  On April 4, 2016, Schauer and Plaintiff discussed the impending restructuring, at which time Schauer confirmed that there would be separate marketing and training teams, and that Plaintiff would likely be placed on the training team.  (Fitzsimmons Decl. ¶ 2, Ex. 23.)  By April 11, 2016, Plaintiff understood that her position at Patterson would be changing.  (Plaintiff Dep. at 149.)

On April 12, 2016, Plaintiff met with Buschbacher to discuss her workplace concerns, and in particular, her belief that she had been treated differently than male colleagues.  She complained that the men with whom she worked were "buddy/buddy" and "exclusive" and that she believed this was reflected in Killian's attitude towards her and her salary.  (Plaintiff Dep. at 156-59.)  Plaintiff sent Schauer an e-mail the next day.  (Fitzsimmons Decl. ¶ 2, Ex. 27.)  In this e-mail, Plaintiff stated that she would be happy to be the director of the Technology Advisor group, indicated that she considered a Technology Advisor III position to be a demotion, asked whether she should apply for a marketing position, and reiterated the concerns she voiced with HR.  (*Id.*)

On April 18, 2016, Patterson posted three new jobs in the software marketing department.  (Fitzsimmons Decl. ¶ 2, Ex. 26.)  Plaintiff e-mailed Schauer, inquiring about

6

the positions.  Schauer responded by expressing confusion because she believed that

Plaintiff was interested in rejoining the Technology Advisor III team.  (Fitzsimmons

Decl. ¶ 2, Ex. 29.)  Plaintiff indicated that she was "most at home and passionate" about

the Technology Advisor group, but also that she did not want to be a Technology Advisor

III again and that she was worried that passing on a marketing position would be bad for

her future at Patterson.  (*Id.*)  Schauer told Plaintiff that if Plaintiff accepted a

Technology Advisor III position, Patterson would augment the position to include

responsibilities that Plaintiff enjoyed, such as speaking engagements and attending trade

shows.  (Schauer Dep. at 141-42.)

Meanwhile, Buschbacher investigated Plaintiff's complaints about her salary.  In

doing so, he compared salary and personnel information for Plaintiff, Lake, and Compau.

(Fitzsimmons Decl. ¶ 2, Ex. 2 ("Buschbacher Dep.") at 97-98; Fitzsimmons Decl. ¶ 2,

Ex. 31.)  Buschbacher concluded that although Plaintiff's salary was lower than Lake's

and Compau's, the difference was justified because Lake's and Compau's product lines

generated more revenue.  (Plaintiff Dep. at 183-84.)  He also noted that Plaintiff's bonus

eligibility was higher than that of Lake and Compau.  (Fitzsimmons Decl. ¶ 2, Ex. 31;

Plaintiff Dep. at 184-85.)  Plaintiff disagreed with Buschbacher's conclusion.  (Plaintiff

Dep. at 184.)

On April 28, 2016, Plaintiff and Schauer met again to discuss the open marketing

positions.  Plaintiff asked Schauer if she would get a marketing position if she applied.

Schauer responded that it would depend on who applied and that she would hire the most

qualified person.  (*Id*. at 187.)  Plaintiff then asked whether she would get a management

position over technology advisors if such a position opened up.  (*Id*. at 188.)  According to Plaintiff, Schauer reported that she "seriously doubted" that Plaintiff would get such a position.  Plaintiff then indicated that she felt like she was being fired.  (*Id*.)

On Monday, May 2, 2016, Plaintiff met with Schauer and Buschbacher.  (*Id*. at 195.)  Buschbacher offered Plaintiff a severance package, which Plaintiff rejected.  (*Id*. at 196; Fitzsimmons Decl. ¶ 2, Ex. 32.)  Several weeks later, Schauer offered Plaintiff a full-time position as a Technology Advisor III.  (Fitzsimmons Decl. ¶ 2, Ex. 33.)  Plaintiff never responded to the offer and never applied for an open position.  At the time Plaintiff left Patterson, her salary was approximately $97,000.  (*Id*. ¶ 2, Ex. 34.)

Plaintiff filed the present action on July 20, 2016.  (Doc. No. 1 ("Compl.").)  Plaintiff amended her Complaint on October 13, 2016.  (Doc. No. 15 ("Am. Compl.")  In her Amended Complaint, Plaintiff asserts four claims:  (1) violation of Equal Employment Pay Act ("EPA") (29 U.S.C. § 206(d)(1)); (2) gender discrimination under the Minnesota Human Rights Act ("MHRA") (Minn. Stat. § 363A.08, subd. 2); (3) reprisal under the MHRA (Minn. Stat. § 363A.15); and (4) violation of the Minnesota Whistleblower Act ("MWA") (Minn. Stat. § 181.932).

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574

F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna

Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported

motion for summary judgment "must set forth specific facts showing that there is a

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see

also Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

## II.    Equal Pay Act

In Count I, Plaintiff alleges that Patterson violated the EPA by paying Plaintiff less

than her male colleagues, Compau and Lake. To establish a prima facie case under the

EPA, Plaintiff must show that the jobs at issue are substantially similar. *Grover v.

Smarte Carte, Inc*., 836 F. Supp. 2d 860, 867 (D. Minn. 2011). Plaintiff can make that

showing by demonstrating that her position as a CTMM and the positions of Lake and

Compau involved equal work in jobs that required equal skill, effort, and responsibility,

and that were performed under similar working conditions. *See* 29 U.S.C. § 206(d)(1);

*Grover*, 836 F. Supp. 2d at 865. If Plaintiff makes such a showing, Patterson must

establish one of the four exceptions to the EPA: (1) a seniority system; (2) a merit

system; and (3) a system that measures quantity or quality of production; or (4) that the

pay differential was based on a factor other than gender. *Id.* Patterson argues that Plaintiff's EPA claim fails because Plaintiff's position as a CTMM is significantly different than the marketing manager positions held by Lake and Compau.

There is no dispute that Patterson paid Plaintiff less than Compau and Lake. Therefore, the question is whether the jobs were "substantially equal." The positions of Plaintiff's male colleagues need not be identical to be considered equal under the EPA. *Krenik*, 47 F.3d at 961. In addition, job titles and classifications are not dispositive. *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002). Instead, the actual requirements of the jobs control the Court's analysis. *Id.* A determination of whether two jobs are substantially equal "'requires a practical judgment on the basis of all the facts and circumstances of a particular case,' including factors such as level of experience, training, education, ability, effort, and responsibility." *Id.* at 1030 (citation omitted). Equal jobs could require "[i]nsubstantial or minor differences in the degree or amount of skill and responsibility" required for the performance of jobs. *Id.* (citing 29 C.F.R. § 1620.14(a)).

Patterson maintains that Plaintiff's CTMM position was not substantially similar to the positions of Lake and Compau. Patterson points to evidence that as CTMM Plaintiff was primarily responsible for marketing Eaglesoft, a dental practice software (a portion of which Patterson gave to dental practices for free) and CAESY, a patient education software. In contrast, Patterson highlights that Lake and Compau marketed digital equipment manufactured by an outside vendor that costs hundreds of thousands of dollars per unit. (Killian Dep. at 230.) Patterson also points to evidence that in fiscal

10

year 2016, Lake's and Compau's products generated significantly more revenue than

Eaglesoft and CAESY.  Patterson also argues that the record reflects a vast difference in

responsibility between Plaintiff's CTMM position and the positions of Lake and Compau.

Plaintiff disagrees and argues that Patterson cannot use revenue streams to show that

Plaintiff's job involved less responsibility.  Plaintiff calls into question Patterson's

evidence on this front, claiming that Patterson fails to cover revenue streams for the

entire relevant time period and to account for sundry sales.[2]  In sum, Plaintiff argues that

Patterson's incomplete revenue analysis cannot be used to show that the relevant jobs

were not similar.

　　　Viewing the evidence in the light most favorable to Plaintiff, the Court determines

that there are genuine issues of material fact surrounding the question of whether Plaintiff

performed substantially equal work as Compau and Lake for Patterson.  Although both

Compau and Lake held different positions than Plaintiff (Marketing Managers III versus

CTMM) and were responsible for different products, all of their positions were

essentially marketing positions.  And while the revenue generated by the respective

products is relevant, there are fact issues surrounding the economic analysis on that point.

Moreover, Patterson does not specifically argue that an exception to the EPA applies.

Instead, Patterson appears to rely on its argument that Plaintiff cannot make out a

prima facie case due to differences in the stated job responsibilities and sales numbers.

---

[2]　　　Sundries are dental supplies that are sold through Patterson's sales representatives.
Patterson contends that Plaintiff was not responsible for sundries and that the sundry
business segment does not fall under the purview of her former supervisors.

This is insufficient to prove that an exception to the EPA applies. Therefore, the Court denies Patterson's motion for summary judgment on Plaintiff's EPA claim.

### III.    MHRA Gender Discrimination

In Count II, Plaintiff asserts a claim for gender discrimination under the MHRA. The MHRA specifies that it is an unfair employment practice to discriminate against a person with respect to "hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of an employer's sex. Minn. Stat. § 363A.08, subd. 2. Plaintiff's MHRA claims are properly analyzed under the law developed under Title VII. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010).

When analyzing indirect evidence of discrimination, courts apply the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Torgerson*, 643 F.3d at 1046. Under the *McDonnell Douglas* framework, if Plaintiff is able to establish a prima facie case of discrimination, the burden then shifts to Patterson to produce a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If Patterson is able to articulate such a reason, the burden then shifts back to Plaintiff to produce evidence sufficient to create a genuine issue of material fact showing that the proffered reason is merely a pretext for unlawful discrimination. *Id.* The ultimate issue at this stage is whether Plaintiff can produce sufficient evidence that unlawful discrimination was a motivating factor in Patterson's employment decisions. *Id.*

To establish a prima facie case of discrimination, Plaintiff must show:  (1) she is a member of a protected group; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) circumstances exist which create an inference of discrimination, which can be shown by demonstrating that similarly-situated employees of the opposite sex were treated differently.  *See, e.g.*, *id*. (discussing prima facie case in hiring context).  Patterson argues that Plaintiff's discrimination claim fails because she does not identify an adverse employment action and because she cannot establish that she was treated differently than similarly-situated male employees.[3]

### A.    Adverse Employment Action

Plaintiff argues that she can show that she suffered an adverse employment action based on treatment she received at Patterson.  Plaintiff relies on the following facts: (1) she accepted the CTMM position at a lower salary with the expectation that her salary would grow; (2) her supervisor, Killian, did not provide necessary direction or communication needed for her success and advancement in the CTMM position; (3) Killian excluded Plaintiff from work activities that prevented Plaintiff from expanding in her CTMM role; and (4) that Plaintiff voiced concerns about the above, but the adverse treatment continued.  Specifically, Plaintiff asserts that she was excluded from networking events, meetings, off-site strategic planning meetings involving her products, and that Killian did not provide adequate direction to her regarding her

---

[3]    For the purposes of this motion, there is no dispute that Plaintiff is qualified and a member of a protected class.

performance and goals.[4]  Plaintiff asserts that after being placed under the supervision of
Killian, she got neither the direction nor the communication needed to perform her duties
or to advance.

    To establish an adverse employment action, a plaintiff must demonstrate "a
tangible change in working conditions that produces a material employment
disadvantage."  *Wedow v. City of Kan. City*, 442 F.3d 661, 671 (8th Cir. 2006).  An
adverse employment action might include "[t]ermination, cuts in pay or benefits, and
changes that affect an employee's future career prospects," as well as "circumstances
amounting to a constructive discharge."  *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir.
2007) (citation omitted), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043.
"Minor changes in duties or working conditions, even unpalatable or unwelcome ones,
which cause no materially significant disadvantage, do not" rise to the level of an adverse
employment action.  *Id*.

    Patterson maintains that none of the allegations above rise to the level of an
adverse employment action.  In support, Patterson points to cases where similar
complaints by employees did not amount to an adverse employment action.  For example,
Patterson relies on *Clegg v. Ark. Dep't of Corrs.*, 496 F.3d 922 (8th Cir. 2007).  In *Clegg*,

---

[4]    The MHRA provides that a claim of unfair discriminatory practice must be
brought as a civil action "within one year after the occurrence of the practice."  *See* Minn.
Stat. § 363A.28, subd. 3.  Because Plaintiff filed her Complaint on July 20, 2016,
Patterson argues that any alleged discriminatory practices that occurred after July 20,
2015 are time-barred.  The Court need not determine if the alleged examples are
time-barred because, as explained herein, Plaintiff's gender discrimination claim fails
even when considering the allegedly time-barred practices.

the Eighth Circuit affirmed the district court's determination that a plaintiff failed to

establish an adverse employment action where the plaintiff submitted evidence that upon

returning from military duty, she was put in a different position with a different rate of

pay, denied training, given a poor evaluation, and not welcomed or given tools to be

productive upon her return.  496 F.3d at 927-28.  Similarly, in *Higgins*, the Eighth Circuit

affirmed the district court's finding that the alleged denial of mentoring and training did

not rise to the level of an adverse employment action.  481 F.3d at 586-87.

On the other hand, Plaintiff cites to cases that leave room for a finding that similar

complaints could support a claim of discrimination if the alleged actions result in a

material adverse consequence affecting future employment opportunities.  *See Grover*,

836 F. Supp. 2d at 868; *Wiley v. Glassman*, 511 F.3d 151, 157 (D.C. Cir. 2007).  These

cases, however, are distinguishable on key points.  First, in *Wiley*, the court held that the

denial of the opportunity to participate in a manager rotation program with other

employees that could have resulted in a promotion to managing editor was an adverse

employment action.  511 F.3d at 157.  Here, however, there is no evidence that Plaintiff

was denied access to any specific training opportunity that was a gateway to a promotion.

Second, in *Grover*, the court held that the denial of earned promotions and an opportunity

for expanded responsibility could be an adverse employment action.  836 F. Supp. 2d at

869.  Here, however, Plaintiff does not cite to evidence showing that she was denied an

earned promotion or that she was specifically denied expanded responsibility.  Instead,

Plaintiff asserts more obliquely that she was denied direction and communication from

Killian, and additionally that she was excluded from work activities that hindered her

15

advancement.  To this end, however, Plaintiff's claims are vague and lack record support that would show that Killian's alleged treatment of Plaintiff directly affected her ability to perform or advance in her job.

While there could be a case where a supervisor's alleged lack of direction and exclusion of an employee from work and networking events could, when taken together, lead a reasonable fact finder to conclude that the actions resulted in materially adverse consequences to the employee, this is not such a case.  Viewing the record in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to support a prima facie case of gender discrimination on the basis that she was excluded from networking and other work events and that she did not receive adequate direction or communication from her supervisor.

### B.    Gender Discrimination Based on Unequal Pay

While linked with other alleged adverse employment actions, Plaintiff appears to argue that Patterson violated the MHRA by paying her less than her male colleagues.  To the extent that she makes such an argument, and for the reasons discussed above with respect to Plaintiff's EPA claim, Plaintiff states a prima facie case of gender discrimination based on her allegation of lesser pay.  However, unlike under the EPA, which creates a type of strict liability and does not require a showing of discriminatory intent, under the MHRA, the plaintiff retains the ultimate burden of proof to show discriminatory intent and pretext.  *See Strecker v. Grand Forks Cty. Soc. Serv. Bd.*, 640 F.2d 96, 99 n.1 (8th Cir. 1980) (noting the substantive and procedural differences

16

between EPA and Title VII discrimination claims), *overruled on other grounds*, *Pullman-Standard v. Swint*, 456 U.S. 271 (1982).

Here, Patterson asserts that the differences in pay reflect the fact that Plaintiff marketed products with lower revenue streams and worked in a position with less responsibility than Lake and Compau. This legitimate, nondiscriminatory reason shifts the burden back to Plaintiff, who must point to facts in the record that could lead a reasonable juror to conclude that the reason is pretextual for gender discrimination. Plaintiff has not done so. Instead, Plaintiff attempts to show discriminatory intent by arguing that Killian interacted with men more frequently and (without citations) asserts that "the record is replete" with examples of conduct showing that Killian's behavior towards men was different than with Plaintiff. Viewing the record in the light most favorable to Plaintiff, no reasonable juror could conclude that the reason for the pay disparities was pretext for discrimination. Therefore, Plaintiff's gender discrimination claim under the MHRA is properly dismissed.[5]

## IV.    Retaliation

In Count III, Plaintiff asserts a reprisal claim. Specifically, Plaintiff contends that she was retaliated against after complaining about Patterson's allegedly unlawful treatment of her. The MHRA provides that it is an unfair discriminatory practice for an

---

[5]    The Court notes that Plaintiff's EPA claim survives because it is analyzed under a different framework than the MHRA. Plaintiff set forth a prima facie case under the EPA, placing the burden on Patterson to prove that the wage disparity was the result of a differential other than gender. Under the MHRA, Patterson articulated a legitimate, nondiscriminatory reason, which shifted the burden to prove discriminatory intent and pretext back to Plaintiff. Plaintiff simply has not met this burden.

employer to "intentionally engage in any reprisal against any person because that person . . . opposed a practice forbidden" by the MHRA. Minn. Stat. § 363A.15(1).

The Court analyzes Plaintiff's retaliation claims under the framework set forth under *McDonnell Douglas*. Under that framework, a plaintiff must first establish a prima facie case of retaliation by demonstrating that she engaged in a protected activity, that she suffered an adverse employment action, and that there was a causal connection between the two. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) (analyzing Title VII claims under burden-shifting framework); *see also Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1016-17 (8th Cir. 2017) (explaining that reprisal claims under the MHRA are analyzed using the *McDonnell Douglas* framework). If a plaintiff establishes a prima facie case, the burden shifts back to the employer to articulate a legitimate, non-retaliatory reason for its action, after which the burden shifts back to the plaintiff to point to evidence that creates a fact issue that the proffered reason was pretextual and that creates a reasonable inference that the defendant acted in retaliation. *Stewart*, 481 F.3d at 1043.

To establish a prima facie retaliation claim based on the failure to hire, Plaintiff must identify a specific job, demonstrate that the job was available, and show that she was qualified and applied for the job. *Green v. City of St. Louis*, 507 F.3d 662, 666 (8th Cir. 2007) (explaining that in a refusal to hire claim involving the False Claims Act, the plaintiff must show that she applied and was qualified for an open job); *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1216 (8th Cir. 1990). Here, Plaintiff argues that after complaining about discriminatory treatment, she was told that as part of the restructuring

18

she would be offered a Technology Advisor III position, which Plaintiff saw as a demotion, instead of a marketing manager position. The record, however, demonstrates that the available marketing manager positions that Plaintiff now asserts she should have been offered were posted in April 2016 and that Plaintiff never applied. Therefore, Plaintiff cannot use Patterson's failure to offer Plaintiff those positions as a basis for a retaliation claim. Moreover, the "TA management" position that Plaintiff cites to did not exist. While the record demonstrates that at one time Schauer envisioned creating such a position, she instead created a position for a "Customer Education and Training Manager." Plaintiff has not made a showing that she applied for or was qualified for that position. Because Plaintiff has not demonstrated that she was denied an existing position that she applied for, she cannot use Patterson's failure to offer her such a position to support a prima facie case of retaliation. Accordingly, Count III is properly dismissed.

## V.    Whistleblower

In Count IV, Plaintiff asserts that Patterson violated the MWA. The MWA protects an employee from discharge or other retaliation when the "employee . . . in good faith, reports a violation or suspected violation of any federal or state law or common law or rule adopted pursuant to law to an employer . . . ." Minn. Stat. § 181.932, subd. 1(1). Minnesota courts apply the *McDonnell Douglas* burden shifting analysis to claims filed under the whistleblower statute. *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). To establish a prima facie case, Plaintiff must establish: (1) that she engaged in statutorily protected conduct; (2) an adverse employment action taken by Patterson; and (3) a causal connection between the two. *Id*. Once established, Patterson

19

has the burden to show a legitimate, nondiscriminatory reason for the employment action. *Id*. Plaintiff then must demonstrate that Patterson's reason is a pretext for retaliation. *Id*.

Here, Plaintiff's MWA claim is based on the same acts that Plaintiff asserts in support of her MHRA reprisal claim. And Patterson correctly points out that the MHRA has an exclusivity provision that provides:

> Nothing contained in this chapter shall be deemed to repeal any of the provisions of the civil rights law or of any other law of this state relating to discrimination because of . . . sex . . . ; but, as to acts declared unfair by sections 363A.08 to 363A.19, . . . the procedure herein provided shall, while pending, be exclusive.

Minn. Stat. § 363A.04 ("Construction and Exclusivity"). Moreover, the Minnesota Supreme Court has held that the exclusivity provision of the MHRA bars an MWA claim that is based on the same facts as an MHRA reprisal claim. *See Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 484 & 486 (Minn. 1996) (explaining that the "exclusivity provision of the Human Rights Act operates as a bar to the separate maintenance" of an identical claim under the MWA).

Because Plaintiff bases her claims under the MWA on the same facts as her MHRA reprisal claim, her MWA claim is barred. Therefore, the Court grants Defendant's motion for summary judgment on Count IV.

## CONCLUSION

While Plaintiff's equal pay act claim survives Defendant's motion for summary judgment because of existing issues of material fact regarding whether Plaintiff and her higher paid male colleagues performed substantially equal work, the Court notes this claim survives narrowly. A victory at this stage of the litigation is no guarantee that

Plaintiff will ultimately prevail at trial. Indeed, Plaintiff's case rests on a small number of disputed facts and a jury could also reasonably resolve many of those issues in favor of Defendant. For example, a reasonable view of the evidence could lead a jury to conclude that the jobs performed by Lake and Compau were not substantially equal to Plaintiff's and, therefore, any differential in pay was not unlawful. In this case, the Court believes that settlement would serve the interests of all parties.

**ORDER**

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. [49]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Plaintiff's Equal Pay Act claim (Count I) will proceed to trial.

2. Plaintiff's claim for gender discrimination under the MHRA (Count II) is **DISMISSED**.

3. Plaintiff's reprisal claim (Count III) is **DISMISSED**.

4. Plaintiff's Whistleblower claim (Count IV) is **DISMISSED**.

Dated:  March 21, 2017                    s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge